**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHIRLY A. COSTANZI, | CASE NO. 1:14-cv-00752-CCC-GBC |
| Plaintiff, | (CHIEF JUDGE CONNER) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 4, 5, 6, 7, 8 |

## REPORT AND RECOMMENDATION

### I.  Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Shirley A. Costanzi for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act").

Plaintiff asserts disability arising from a work injury after a hard metal object hit her left temple and rendered her unconscious. Plaintiff's treating source medical opinions indicated that she was disabled as a result of physical and mental impairments. With regard to physical impairments, these opinions are essentially uncontradicted. A one-time gynecologist submitted an opinion that Plaintiff had no

limitations, but this opinion has minimal probative value. Plaintiff produced objective evidence of a "frozen left shoulder," capsulitis, disc herniations, degenerative disc disease, and kyphotic collapse.  With regard to mental impairments, these opinions are contradicted only by a state agency psychologist who used an incorrect date last insured ("DLI"). Plaintiff produced objective evidence of posttraumatic stress disorder ("PTSD"), depression, panic disorder, social anxiety, and attention deficit hyperactivity disorder ("ADHD"). Providers prescribed medications, including opiates, with known side effects.

An ALJ may not assess an RFC greater than uncontradicted medical opinions. An ALJ must seriously consider even conclusory uncontradicted medical opinions from treating professionals, and recontact those professionals if the support for those opinions is unclear. Here, the ALJ's assessment of Plaintiff's physical function exceeds all of the medical opinions. The ALJ's decision lacks substantial evidence. As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.    Procedural Background

On January 27, 2011, Plaintiff filed an application for DIB under the Act. (Tr. 147). On July 14, 2011, the Bureau of Disability Determination denied Plaintiff's application (Tr. 90-107), and Plaintiff filed a request for a hearing on

July 28, 2011. (Tr. 114). On September 7, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 30-64). On September 24, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 9-29). On October 22, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7-8), which the Appeals Council denied on February 21, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On April 14, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On July 2, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 4, 5). On August 6, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 6). On September 8, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 7). On September 18, 2014, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 8). On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.   Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV. Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.

1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on July 12, 1963 and was classified by the regulations as a younger individual on her date last insured. 20 C.F.R. § 404.1563. (Tr. 23). Plaintiff has at least a high school education and past relevant work as a grinder/polisher and as a machine operator. (Tr. 18). In November of 2005, Plaintiff was injured in a work-related accident after a steel door hit the left side of her head (Tr. 201, 205). She treated with physical therapy, medications, injections, and surgery. (Tr. 199-232).The relevant period for this application is from February 23, 2010 through her date last insured of June 30, 2011. (Tr. 13-25).

## A. Function Report and Testimony

In a Function Report dated April 4, 2011, Plaintiff indicated problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, seeing, and using her hands. (Tr. 181). She indicated that she experienced constant pain in her neck and back. (Tr. 181). She reported that she could not walk more than a block and did not cook more than small meals. (Tr. 179, 181). She reported that her son and husband do most of the housework and yardwork and that she could no longer perform most of her hobbies. (Tr. 178). She also indicated problems with memory, completing tasks, concentration, understanding, following instructions,

and getting along with others. (Tr. 181). When asked how well she followed spoken instructions, she wrote "I don't, I start yelling and slam the door." (Tr. 181). She explained that she did not get along with authority figures well, indicating that she wanted to "rip [her son's teacher] apart" after an after school meeting. (Tr. 182). She indicated problems on the job due to problems getting along with others when a coworker "took the overhead crane from [her] and didn't bring it back. [She] had to go get it. He got so cocky. So I told him next time I'd wrap it around his neck and put him up to the ceiling." (Tr. 182). She indicated that she did not "handle stress at all." (Tr. 182). She reported that she did not go to social activities and lashes out at people. (Tr. 181).

On September 7, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 38). Her counsel represented that her disability stemmed from her work injury, explaining that:

> This happened several years ago. She has a high school education. But before this accident, she was a highly active indivldual, engaged in many activities: sports, gardening, guitar, and whatever. This has changed her life. Originally, this claim was going down primarily as a claim, a physical claim, under either 1.02 or 1.04. Because the nature of the blow has left problems in her cervical spine, primarily, but down into the thoracic spine, she's shown muscle spasms, change of curvature, and her shoulder's been affected. She's been diagnosed with adhesive capsulitis on her left side, she has diminished range of motion, she's in constant pain, and the natural things that follow that, which are inability to concentrate and really do any significant types of lifting or moving about, and requiring a lot of changes. What's happened since then is that the changes in her life have been so severe that they have left her with a constellation of psychological

symptoms. She's got diagnosed depression. If you look at the -- Dr. Stewart's consultative exam in, I think it's 15F, it's probably the most comprehensive; although Dr. Minora, throughout his reports, does see the same things. She's got anxiety, she has anger issues, which, she never had those before. And Dr. Stewart, I think, clearly, her report brings her within 12.04A. I think Dr. Minora has, for the Department of Welfare, brought her within 12.04A, as well, and particularly in combination of things. She's got marked problems with interacting with the public/supervisors/coworkers, pressures, reaction to changes; she's got impulse control problems; she's unable to understand and remember complex tasks and, and moderately unable to understand short tasks; she's lost memory, functionality, and all those, and all those areas. So, I think that under either the physical, as she's going to describe it, or under, certainly, under the psychological, and definitely under the combination of both, she would be unable to engage in SGA.

(Tr. 35). Plaintiff testified to problems turning her head left and right while driving. (Tr. 38). Plaintiff testified that she did not remember the dates on which she saw her physicians. (Tr. 41). She testified to pain from "the hole in [her] head," down her neck to her back and left shoulder. (Tr. 42). She testified that her fingers go numb. (Tr. 42). She testified that she did not remember the names of her medications. (Tr. 41-43). She testified that she was "always tired" and "fatigued" because she could not sleep. (Tr. 44).

With regard to mental impairments, she testified that she had no email address because she something "didn't come up quick enough" so she "got mad" and "just smashed it." (Tr. 46). She testified that she stays in her room most of the time with the television on. (Tr. 46). She testified that she does not "do well around a lot of people" and "get[s] edgy," so she did not go on trips or vacations. (Tr. 46).

She testified that she tried to play her guitar, but sometimes could not remember what she was doing, so she throws it. (Tr. 46). She testified that she did not go shopping, explaining that "I don't deal with the people in the grocery store, because you get behind some people, and they're too slow, or they'll say, oh, no, you've got to take this back. And I just flip out in the store, so I just, I don't go to pick up groceries." (Tr. 47). She testified that she took medications for mental impairments, but was not in counseling because "every time I went, they would -- I would be talking to somebody different, and they don't know me, and they're just asking me questions. So, then, I just, I would just sit there. So, I stopped going to see them." (Tr. 48). She testified that she had headaches every day. (Tr. 51). She testified that her insurance "only lets me see four doctors a year, and that's, that's not per doctor." (Tr. 54). Plaintiff interrupted the vocational expert testimony, asking "[d]o you have any bottled water? This water is terrible." (Tr. 60).

## B. Medical Evidence

In September of 2009, Plaintiff was status-post laminectomy and discectomy. (Tr. 205). She was anxious to get back to work, and was released back to work by her physician. (Tr. 205). On September 14, 2009, Plaintiff was discharged from physical therapy with some of her goals not met. (Tr. 219). Her insurance would not cover any more therapy. (Tr. 227). She continued to have global weakness in her left upper extremity and adhesive capsulitis. (Tr. 228). She

remained unable to do housework or play her guitar. (Tr. 219). She continued to have difficulty with reaching, pushing, and pulling activities. (Tr. 231).

In December of 2009, primary care physician Dr. Barry Minora, M.D., referred Plaintiff to Dr. Alan P. Gillick, M.D., for complaints of bilateral back and shoulder pain. (Tr. 260). Plaintiff reported headaches and "frozen left shoulder." (Tr. 250). Plaintiff had tenderness and decreased range of motion in her shoulder. (Tr. 260). Dr. Gillick noted that MRI showed "herniations at C5-6 and C6-7 with collapsing kyphotic alignment." (Tr. 260). He noted that surgery was "an option" and that she "would be looking at a two level anterior discectomy and fusion in order to restore sagittal alignment and fuse the injured segments." (Tr. 260). Plaintiff's symptoms and complaints were the same at a follow-up in March of 2010, and Plaintiff indicated that she wanted to "hold on anything surgical." (Tr. 259). She elected to pursue treatment with "restricted activities" and medication. (Tr. 259).

In September of 2010, Plaintiff reported pain the intrascapular area and exhibited tenderness in the thoracic spine. (Tr. 257). Dr. Gillick opined that it was "either referred from the cervical [impairments] or is soft tissue, such as muscle ligamentous, in nature." (Tr. 257).

Plaintiff treated at Scranton Counseling Center from June of 2009 to December of 2010.[1] (Tr. 264). Plaintiff continued to struggle with her life changing, and indicated that she was "very upset" that her former employer would not take responsibility for hurting her. (Tr. 274, 278). Plaintiff exhibited irritable and depressed mood and reported anger problems. (Tr. 274). She reported isolating in her room. (Tr. 283). Her diagnoses included depression and ADHD and she was assessed a GAF of 50 or 55. (Tr. 276, 285). She was treated with Vyvanse, Prozac, and trazodone. (Tr. 282). In September of 2009, Adderall was substituted for Vyvanse. (Tr. 301).

On November 12, 2010, Dr. Minora noted that Plaintiff presented with "complaints of anxiety and inability to focus. She stopped her Prozac approximately 2 weeks ago AGAINST MEDICAL ADVICE…She is very anxious. She is crying. She was brought to the office today by her spouse [who] was very concerned about her." (Tr. 520). Plaintiff was instructed to resume her medications. (Tr. 521). Dr. Minora also observed point tenderness in her thoracic spine, which was "concerning" to him, and he ordered imaging studies. (Tr. 521).

In February of 2011, a thyroid uptake scan indicated Graves' disease. (Tr. 534). She continued to report anxiety, and medications included Prozac, Adderall, Propranolol, Ernla, Trazodone, Vicodin, Xanax, and Imitrex. (Tr. 534). Diagnoses

---

[1] Plaintiff also treated at Scranton Counseling Center prior to these dates. (Tr. 287).

included panic disorder and ADHD. (Tr. 535). In April of 2011, Dr. Minora noted that Plaintiff was complaining of lower quadrant pain and had "known bilateral ovarian cysts." (Tr. 531). She was considering a hysterectomy. (Tr. 531). She reported discomfort in her right upper extremity after she "punched a wall." (Tr. 531). He "strongly recommended" an X-ray, but Plaintiff refused. (Tr. 532). In May of 2011 she underwent an elective thyroidectomy for a multinodular goiter. (Tr. 529). After the surgery, her calcium was low and she was placed on Synthroid. (Tr. 525). She reported chronic fatigue, depression, shakiness and jitteriness. (Tr. 524).

On April 25, 2012, Plaintiff presented to Dr. Gillick complaining of pain "all over her body, in her neck that radiates to her shoulders, in her low back that radiates to her leg, especially the right leg." (Tr. 495). Examination indicated tenderness, pain on range of motion, and decreased sensation in two digits of her left hand. (Tr. 495). X-rays "continue[d] to show degenerative narrowing of the C5-6 and C6-7 disk spaces" and Dr. Gillick opined that she "aggravated her underlying degenerative disk condition and is causing her ongoing cervical discomfort." (Tr. 495).

On May 3, 2012, Plaintiff presented to Dr. Minora complaining of malaise and fatigue. (Tr. 511). Medications included Imitrex, Xanax, Vicodine, Trazodone, Emla, Adderal, Prozac, Oscal, Vitamin D, and Levothyroxine Sodium. (Tr. 511).

She also reported right knee pain and joint pain. (Tr. 513). Examination was within normal limits. (Tr. 505).

On August 8, 2012, Dr. Minora noted that Plaintiff "comes to office with same complaints of depression with anxiety secondary to neck pain and shoulder pain with decreased range of motion with flexion extension of the neck in forward elevation of her shoulder. Can no longer lift any object greater than 10 pounds… continues to have insomnia from posttraumatic stress disorder and memory problems from head trauma. She especially has short-term memory disorder." (Tr. 504). Examination indicated decreased range of motion in the neck and "forward elevation of bilateral shoulders remain[ed] fixed at 45 degrees bilaterally." (Tr. 505). Dr. Minora noted that she "continue[d] to have significant weakness and decreased range of motion secondary to pain in neck and shoulder girdle." (Tr. 505).

## C. Opinion Evidence

With regard to mental impairments, as discussed below, Dr. Minora opined on three different occasions that Plaintiff was permanently disabled in part due to depression, PTSD, and post-concussion syndrome. (Tr. 487, 503, 509-10).

On June 21, 2011, state agency consultative examiner Dr. Victoria Stewart also opined that Plaintiff had work-preclusive functional limitations. (Tr. 464-69).

"Her affect was flat and stable" and she "presented as dysphoric, distracted and detached." (Tr. 466). She noted:

> When asked about what she likes to do for enjoyment, Ms. Costanzi reported that before "the accident," she was very active and enjoyed playing the guitar, gardening, swimming, playing golf, and going out on boats with her husband. Ms. Costanzi explained that since the accident, she is very limited in the activities she can engage in, due to the "constant pain" she experiences in her back, neck, and shoulders. She indicated that she rarely spends time with people, stating, "I don't go around people that much because they annoy me." Her husband explained that Ms. Costanzi isolates herself from her family and friends, and will spend "all day and night" in her bedroom.
> …
> Ms. Costanzi explained that her life has changed drastically since the accident, her husband confirmed this. She explained that she has difficulties with short- and long-term memory, gets easily irritated, angry, and frustrated, and isolates herself from others. Ms. Costanzi repeatedly described people as "annoying," and recounted an incident which occurred recently in which she got out of her car while she was driving, to yell at another driver who had cut her off. Her husband explained that while Ms. Costanzi did not exhibit these behaviors before her accident at work, she is now very easily agitated and becomes angry very quickly. Ms. Costanzi explained that she and her husband often get into arguments, because she knows that she has told him something, but he indicates that she has not talked to him about specific things. She also explained that people tell her that she often repeats herself.
> …
> Ms. Costanzi reported that she has experienced symptoms of depression since her accident at work in 2006. She stated, "All my dreams are shattered. Sometimes you just want to take the bridge, you know?" She reported that she feels down and sad, has difficulties falling asleep and staying asleep at night, experiences decreased motivation and energy, fatigue, anhedonia, decreased appetite, crying spells, isolates herself from others, and experiences feelings of hopelessness, worthlessness, and suicidal ideation. She denied suicidal intent or plan, although she indicated that she has considered committing suicide in the past.

(Tr. 466-67). Plaintiff "explained that her health insurance will only cover four physician visits a year. She explained that this is not enough coverage for her, and she has several specialists that she is supposed to see on a regular basis." (Tr. 467). Plaintiff also "explained that 'every time' she went to an appointment at Scranton Counseling Center, she saw someone different, which was difficult for her." (Tr. 468). Examination indicated:

> [W]hen asked to identify the previous president, she answered Cheney. Her concentration ability appeared to be impaired. The evaluator has to repeat questions to Ms. Costanzi on several occasions, and she appeared to be easily distracted. Ms. Costanzi was able to immediately recall a list of three non-related words. At a five-minute interval, she was only able to recall one of the three non-related words. She was able to repeat four digits forward and three digits backward; however, the evaluator had to repeatedly remind her to repeat the digits backward and not forward. Her immediate recall appeared to be intact; however, her short-term and long-term memory appeared to be impaired. She appeared to have significant difficulty recalling specific dates, time spans, and names of companies she had worked for. She also appeared to talk about events in a non-sequential order.

(Tr. 468). She diagnosed Plaintiff with "severe" recurrent depression, assessed her to have a GAF score of 35 and recommended memory testing. (Tr. 469). She opined that Plaintiff did "not appear to be able to manage her funds in a competent manner." (Tr. 469). The state agency did not obtain the recommended memory testing. Doc. 5.

On July 14, 2011, Dr. Paul Perch, Ed.D., reviewed Plaintiff's file and authored a medical opinion. (Tr. 104). Dr. Perch's opinion was for an incorrect date last insured of January 23, 2011, and did not address her functioning through June 30, 2011. (Tr. 98, 100). He cited only some of the findings from the consultative examination, and did not mention her problems with short-term and long-term memory or her concentrations difficulties as noted by Dr. Stewart. (Tr. 98). He opined she had mild restriction in activities of daily living and moderate limitations in concentration, persistence and pace and maintaining social functioning. (Tr. 98). He opined that she had no more than moderate limitation in any work-related function except handling detailed instructions. (Tr. 98, 102-04).

With regard to gynecological impairments, on April 28, 2011, gynecologist Dr. M. Bijoy Thomas, M.D., completed medical opinion after a one-time examination. Dr. Thomas specifically limited this opinion to gynecological impairments, writing that she had "no limitations from our standpoint." (Tr. 374).

With regard to Plaintiff's other physical impairments, on June 18, 2011, Dr. Minora authored a medical opinion for the Pennsylvania Department of Public Welfare. (Tr. 487). He opined that Plaintiff could not sit for more than ten minutes or walk more than one city block without pain. (Tr. 487). He also cited mental impairments, including depression and PTSD, and opined that she was permanently disabled. (Tr. 487). He indicated that she needed health sustaining

medications for her mental and physical impairments, including chronic pain syndrome and memory impairment. (Tr. 487). He explained that Plaintiff had suffered traumatic injury to her cervical spine and left shoulder. (Tr. 488). He noted that his opinion was based on a physical examination, review of medical records, clinical history, tests and diagnostic procedures. (Tr. 488). He referred to his office notes. (Tr. 488).

Dr. Stewart also noted that Plaintiff's "gait was slow and labored. She repositioned herself several times on the evaluator's couch, and eventually moved to a chair, explaining that she was experiencing pain in her back, neck and shoulder. Ms. Costanzi also stood up sporadically throughout the evaluation to stretch her back." (Tr. 466).

On August 8, 2012, Dr. Minora authored a medical opinion for the Pennsylvania Department of Public Welfare. (Tr. 508). Dr. Minora opined that Plaintiff was permanently disabled. (Tr. 509). He indicated that Plaintiff had "severe" degenerative joint disease with pain in multiple joints and cervical radiculopathy, along with depression, PTSD, and post-concussion syndrome. (Tr. 509).

On August 31, 2012, Dr. Minora authored a letter that states:

Shirley [has] decreased range of motion with flexion extension of the neck in forward elevation of her shoulder. Shirley can no longer lift any object greater than 10 pounds. Shirley also continues to have insomnia from posttraumatic stress disorder and memory problems

from head trauma. She especially has short-term memory disorder. If you have any additional questions and/or concerns, please feel free to call my office.

(Tr. 503).

No state agency physician performed a consultative examination or records review with regard to Plaintiff's physical impairments. Doc. 5.[2]

### D. ALJ Findings

On September 24, 2012, the ALJ issued the decision. (Tr. 25). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 23, 2010, the alleged onset date, and was insured through June 30, 2011. (Tr. 13). At step two, the ALJ found that Plaintiff's Major Depressive Disorder, Attention Deficit Hyperactivity Disorder (ADHD), Posttraumatic Stress Disorder (PTSD), Panic Disorder, Social Anxiety, Osteoarthrosis, and Chronic Pain Syndrome were medically determinable and severe. (Tr.14). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 15). In crafting the RFC, the ALJ assigned little weight to Dr. Azizkhan's opinion. (Tr. 18). Thus, the ALJ found that Plaintiff had the RFC to perform:

---

[2] The initial disability denial came from a "single decision-maker ("SDM")" who "is a non-examining, nonmedical employee at the state agency level." *Chandler v. Colvin*, 3:14-CV-867, 2014 WL 4793963, at *13 (M.D. Pa. Sept. 23, 2014) (Conaboy, J.) (citing *Yorkus v. Astrue*, CIV.A. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28, 2011) ("There is significant case law supporting the plaintiff's position that the RFC assessment of the SDM is entitled to no evidentiary weight. Additionally, the Agency's own policy prohibits the ALJ from relying on the RFC assessments of an SDM.") (internal citations omitted)). (Tr. 102).

[A] range of light work as defined in 20 CFR 404.1567(b). She was able to occasionally balance, stoop, crouch, and climb, but no ladders, ropes, or scaffolds, and no crawling, kneeling, or bilateral overhead reaching. She had to avoid concentrated exposure to temperature extremes of cold and heat, wetness, humidity, vibrations, and hazards, such as moving machinery and unprotected heights. Lastly, she was not able to perform detailed or complex tasks, and she could have had only occasional interaction with coworkers, the public, and supervisors.

(Tr. 16). At step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 23). At step five, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 23). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 24).

## VI. Plaintiff Allegations of Error

### A. Evaluation of the medical opinions

Plaintiff asserts that the ALJ erred in rejecting all of the relevant medical opinions with regard to physical function and crediting a non-examining, non-treating opinion over both treating and examining medical opinions with regard to mental function. (Pl. Brief).

Under the Regulations, 20 C.F.R. 404.1527(c) states that the ALJ "will evaluate every medical opinion we receive." *Id*. There is a heightened requirement in Section 1527(c)(2), which applies only to treating physicians. Section 1527(c)(2) states that ALJs "will *always give good reasons* in [the] *notice of determination or decision* for the weight [given to] your treating physician's

opinion." *Id.* (emphasis added). *See also Ray v. Colvin*, 1:13-CV-0073, 2014 WL 1371585, at *21 (M.D. Pa. Apr. 8, 2014) ("The cursory manner in which the ALJ rejected Dr. Jacob's opinions runs afoul of the regulation's requirement to " give good reasons" for not crediting the opinion of a treating source upon consideration of the factors listed above. While there may be sufficient evidence in the record to support the ALJ's ultimate decision that Plaintiff was not under a disability, and, thus, the same outcome may result from remand, the court cannot excuse the denial of a mandatory procedural protection on this basis.").

Generally, an ALJ may not reject all of the medical opinions in the record and assess an RFC that is greater than found by the medical professionals. *See Gormont v. Astrue*, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013) (Nealon, J.); *see also Bloomer v. Colvin*, 3:13-CV-00862, 2014 WL 4105272, at *5 (M.D. Pa. Aug. 19, 2014) (Jones, J.); *House v. Colvin*, 3:12-CV-02358, 2014 WL 3866072, at *8 (M.D. Pa. Aug. 6, 2014) (Kane, J.); *Muhaw v. Colvin*, CIV.A. 3:12-2214, 2014 WL 3743345, at *15 (M.D. Pa. July 30, 2014) (Mannion, J.). *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014) (Mariani, J.); *Arnold v. Colvin*, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014) (Brann, J.); *Kaumans v. Astrue*, 3:11-CV-01404, 2012 WL 5864436, at *12 (M.D. Pa. Nov. 19, 2012) (Caputo, J.); *Troshak v. Astrue*, 4:11-CV-00872, 2012 WL 4472024, at *7-8 (M.D. Pa. Sept. 26,

2012) (Munley, J.); *Shedden v. Astrue*, 4:10-CV-2515, 2012 WL 760632, at *11 (M.D. Pa. Mar. 7, 2012) (Rambo, J.); *Duvall-Duncan v. Colvin*, 1:14-CV-17, 2015 WL 1201397, at *11 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *McKean v. Colvin*, 1:13-CV-2585, 2015 WL 1201388, at *8 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *Hawk v. Colvin*, 1:14-CV-337, 2015 WL 1198087, at *12 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.).

As the Third Circuit explained in *Doak v. Heckler,* 790 F.2d 26 (3d Cir.1986), "[n]o physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."). *Id.* at 29. *See also Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence. Again, if the ALJ believed that Dr. Scott's reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician."); *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) ("[A]n ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical

evidence" and not due to his or her own credibility judgments, speculation or lay

opinion.") (internal citations omitted). The Court explained in *Morales* that:

> Dr. Erro's observations that Morales is "stable and well controlled
> with medication" during treatment does not support the medical
> conclusion that Morales can return to work. Dr. Erro, despite his
> notation, opined that Morales's mental impairment rendered him
> markedly limited in a number of relevant work-related activities.
> Other information in the treatment records supports this opinion.
> Thus, Dr. Erro's opinion that Morales's ability to function is seriously
> impaired or nonexistent in every area related to work shall not be
> supplanted by an inference gleaned from treatment records reporting
> on the claimant in an environment absent of the stresses that
> accompany the work setting.

*Id.* at 319.

As Judge Brann explained in *Kester v. Colvin*, 3:13-CV-02331, 2015 WL

1932157 (M.D. Pa. Apr. 21, 2015):

> The Commissioner argues that, contrary to Magistrate Judge Cohn's
> report, an ALJ need not base a Residual Functional Capacity ("RFC")
> determination on a medical opinion. The RFC, according to the
> Commissioner, is strictly a determination for the Commissioner.
> *Brown v. Astrue,* 649 F.3d 193, 197 n. 2 (3d Cir.2011); 20 C.F.R. §
> 416.927(d)(2). As a result, the ALJ is not bound by the medical
> opinions provided by Plaintiff's treating physicians and the state
> agency medical consultant. *Chandler v. Comm'r of Soc. Sec.* 667 F.3d
> 356, 361 (3d Cir.2011). The Commissioner further argues that
> substantial evidence supported the ALJ's determination as she
> examined Plaintiff's record longitudinally before coming to the
> correct RFC assessment.

> Following a *de novo* review, this Court agrees with Magistrate Judge
> Cohn's conclusion that the ALJ should have based her RFC decision
> on at least one physician's opinion. The Commissioner is correct in
> stating that the RFC assessment must be based on consideration of all
> the evidence in the record, including the testimony of the claimant

regarding his activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 121–22 (3d Cir.2002); *see also* 20 C.F.R. § 404.1545(a). The Commissioner is likewise correct in arguing that the ALJ has the sole responsibility to determine a claimant's RFC. *See generally,* SSR 96–5P, 1996 WL 374183 (July 2, 1996). However, '[r]arely can a decision be made regarding a claimant's [RFC] without an assessment from a physician regarding the functional abilities of the claimant.' *Gormont v. Astrue,* Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D.Pa. Mar. 4, 2013) (Nealon, J). An ALJ is not a medical professional and cannot make medical conclusions in lieu of a physician.

As two commentators have explained:

> Sometimes administrative law judges assert that they-and not physicians-have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination based on those administrative definitions and is reserved to the Commissioner. *However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination.* Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the

various types of work that can be performed by
claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability
Law and Procedure in Federal Courts, 344–345 (2014) (emphasis
added).

Moreover, federal courts have repeatedly held that the ALJ cannot
speculate as to a claimant's RFC. The ALJ must support any
functional capabilities conclusions by invoking medical evidence in
the record. *See e.g. Woodford v. Apfel,* 93 F.Supp.2d 521, 529
(S.D.N.Y.2000) ("An ALJ commits legal error when he makes a
residual functional capacity determination based on medical reports
that do not specifically explain the scope of claimant's work-related
capabilities."); *Zorilla    v.    Chater,* 915 F.Supp. 662, 667
(S.D.N.Y.1996) ("The lay evaluation of an ALJ is not sufficient
evidence of the claimant's work capacity; an explanation of the
claimant's functional capacity from a doctor is required."); *see also,
Yanchick v. Astrue,* Civil No. 10–1654, slip op. at 17–19 (M.D.Pa.
Apr. 27, 2011) (Muir, J.) (Doc. 11); *Coyne v. Astrue,* Civil No. 10–
1203, slip op. at 8–9 (M.D. Pa. June 7, 2011) (Muir, J.) (Doc. 21);
*Crayton v. Astrue,* Civil No. 10–1265, slip op. at 38–39 (M.D.Pa.
Sept. 27, 2011) (Caputo, J.) (Doc. 17); *Dutton v. Astrue,* Civil No. 10–
2594, slip op. at 37–39(M.D.Pa. Jan. 31, 2012) (Munley, J.) (Doc.
14); *Gunder v. Astrue,* Civil No. 11–300, slip op. at 44–46 (M.D.Pa.
Feb. 15, 2012) (Conaboy, J.) (Doc. 10); *Ames v. Astrue,* Civil No.
3:11–CV–1775, slip op. at 55–58 (M.D.Pa. Feb. 4, 2013).

Accordingly, the United States Court of Appeal for the Third Circuit
has found remand to be appropriate where the ALJ's RFC finding was
not supported by a medical assessment of any doctor in the record.
*See Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986) (directing remand
because the ALJ's conclusion that the claimant had the RFC to
perform light work was not supported by substantial evidence in light
of the fact that no physician in the record had suggested that the
claimant could perform light work while others had reached different
conclusions.)

*Id.* at *2-3. *See also* Bloomer v. Colvin, 3:13-CV-00862, 2014 WL 4105272, at *6 (M.D. Pa. Aug. 19, 2014) (Jones, J.); ("The ALJ did not cite to a single medical opinion that contradicted [the treating source] opinion; thus, the ALJ improperly set his "own expertise against that of a physician who present[ed] competent medical evidence.' Consequently, the ALJ's residual functional capacity determination is not supported by substantial evidence.") (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (2d Cir.1999)).

Here, with regard to physical impairments, no medical opinion supports the RFC and the ALJ impermissibly assessed an RFC with greater capabilities than all of the medical opinions that addressed physical function. *See Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986). The gynecologist's opinion to which the ALJ assigned great weight was specifically limited to gynecological impairments, and does not support the ALJ's RFC. (Tr. 374-75). Thus, the only way for the ALJ to determine that Plaintiff did not suffer disabling impairments was to independently interpret the medical evidence. This is impermissible. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

Even if the ALJ was entitled to reject Dr. Minora's opinion because it was conclusory, remand would still be required because no medical opinion would support the ALJ's RFC. *See Kester v. Colvin*, 3:13-CV-02331, 2015 WL 1932157, at *2-3 (M.D. Pa. Apr. 21, 2015). Under the facts of this case, where Plaintiff

produced significant objective evidence of physical impairments, it was "incumbent" on the ALJ to obtain a consultative examination or state agency records review in order to reject Dr. Minora's opinion. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). The ALJ has no medical training and was not qualified to interpret this evidence on her own. *Id.*

The ALJ erred in relying on Plaintiff's lack of treatment. Plaintiff's course of treatment is relevant only if the ALJ considers all explanations for noncompliance. Social Security Ruling[3] ("SSR") 96-7p. Plaintiff "explained that her health insurance will only cover four physician visits a year. She explained that this is not enough coverage for her, and she has several specialists that she is supposed to see on a regular basis." (Tr. 467). Plaintiff also "explained that 'every time' she went to an appointment at Scranton Counseling Center, she saw someone different, which was difficult for her." (Tr. 468).

Without a supporting medical opinion, the ALJ's physical RFC assessment lacks substantial evidence. The ALJ also impermissibly independently interpreted the medical evidence to supplant an opinion by a competent professional with his own lay expertise. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). The ALJ did not provide any other reason to reject this opinion. Thus, he ALJ rejected

---

[3] "Social Security Rulings…are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1).

the opinions for the "wrong reason," and consequently, the RFC assessment lacks substantial evidence. *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000).

With regard to Plaintiff's mental impairments, the only opinion supporting the ALJ's RFC was authored by Dr. Perch. However, Dr. Perch's opinion was for an incorrect date of last insured of January 23, 2011, and did not address her functioning through June 30, 2011. (Tr. 98). All treating and examining medical opinions indicated work-preclusive mental limitations. (Tr. 464-69, 503-10). Given the preference for treating and examining sources over state agency sources, this opinion does not provide the ALJ's mental RFC with substantial evidence:

> [O]ur decisions make clear that determination of the existence vel non of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations of error. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: September 30, 2015

_____s/Gerald B. Cohn_____
GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE